# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DISTRICT

Jason Duby,

Plaintiff,

v.

Shirley May's Place, LLC, and
Denise A. Walsh,

Defendants.

File No. 16-cv-11443
Hon. Paul D. Borman
Mag. Judge Elizabeth A. Stafford

/

| | |
|---|---|
| Charlotte Croson (P56589) | Angela L. Jackson (P53930) |
| Joseph X. Michaels (P79084) | Ashley Waddell Tingstad (P81463) |
| NACHT LAW, P.C. | HOOPER HATHAWAY, P.C. |
| 101 North Main Street, Suite 555 | 126 South Main Street |
| Ann Arbor, MI 48104 | Ann Arbor, MI  48104 |
| (734) 663-7550 | (734) 662-4426 |
| ccroson@nachtlaw.com | ajackson@hooperhathaway.com |
| jmichaels@nachlaw.com | atingstad@hooperhathaway.com |
| Attorneys for Plaintiff | Attorneys for Defendants |

/

# DEFENDANTS' RESPONSE IN OPPOSITION
# TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

**Table of Contents**

                                                                                           **Page**

INTRODUCTION....................................................................................................1

FACTUAL BACKGROUND....................................................................................3

LEGAL STANDARD ...........................................................................................11

ARGUMENT .......................................................................................................11

I.      DUBY'S COUNTS I AND II FAIL BECAUSE HIS
        ACTIVITY AT SHIRLEY MAY'S PLACE IS NOT
        COVERED BY THE FLSA OR THE MWOWA....................................12

        a.      Duby Does Not Benefit From "Individual Coverage"
                Because He Was A Putative Co-Owner Of Shirley May's
                Place, Not An "Employee"...................................................13

        b.      Duby Does Not Benefit From "Enterprise Coverage"
                Because Shirley May's Place, As A Family Owned
                And Operated Business With Annual Gross Sales
                Under $500,000 Is Exempt From The FLSA ................................15

II.     WALSH IS NOT AN EMPLOYER WITH INDIVIDUAL
        LIABILITY BECAUSE DUBY OPERATED THE STORE
        AS A CO-OWNER ........................................................................17

III.    DUBY'S COUNT III FAILS BECAUSE HE CANNOT
        SHOW RETALIATORY MOTIVE WHERE WALSH
        TESTIFIED THAT SHE TRULY FEARED FOR HER
        LIFE BUT WAS FORCED TO WITHDRAW HER
        PETITION BECAUSE SHE WAS RECOVERING FROM
        BRAIN SURGERY .........................................................................19

IV.     THERE ARE DISPUTED ISSUES OF MATERIAL FACT
        REGARDING EACH OF WALSH'S COUNTERCLAIMS .................21

ii

**a.**   **Duby Converted Defendants' Property When He Wrongfully Took Items From The Store And His Mother's Home** ................................................................. 21

**b.**   **In The Alternative, Duby Was Unjustly Enriched When He Benefitted From The Funds And Property He Received, Took, Or Held From Defendants** ........................... 22

**c.**   **Duby Tortiously Interfered With Defendants' Business Relationships** ................................................................. 23

**CONCLUSION** ................................................................................. 25

## Index of Authorities

**Cases**                                                                 **Page**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)..............................................11

*Emanuel v. Rolling in the Dough, Inc.*,
  2012 U.S. Dist. LEXIS 166206 (N.D. Ill. Nov. 21, 2012) ....................................14

*Godoy v. Rest. Opportunity Ctr. of N.Y., Inc.,*
  615 F. Supp. 2d 186 (S.D.N.Y. 2009) ...........................................................13, 14

*Morris Pumps v. Centerline Piping, Inc.*,
  729 N.W.2d 898 (Mich. Ct. App. 2006)...............................................................22

*Murray Hill Publ'ns, Inc. v. ABC Communs., Inc.*,
  264 F.3d 622 (6th Cir. 2001) ..............................................................................21

*Steelman v. Hirsch*, 473 F.3d 124 (4th Cir. 2007) ............................................13, 14

*Trarms, Inc. v. Leapers, Inc.*,
  2017 U.S. Dist. LEXIS 70998 (E.D. Mich. May 10, 2017) ...........................23, 24

## Statutes

29 U.S.C. § 203(s)(A)(ii) ...................................................................................13, 17

29 U.S.C. § 203(s)(C)(2)....................................................................................13, 16

29 U.S.C. § 206(a) *et seq.* ................................................................................13, 15

M.C.L.S. § 408.420(1)(b) ........................................................................................12

## Other Authorities

29  C.F.R.  § 779.234 ...............................................................................................16

Plaintiff's Motion for Summary Judgment is premature because the parties have an ongoing discovery dispute, wherein eighteen (18) of Defendants' discovery requests have received no answer. *See* Defs' Mot. to Compel, Doc. 46. Plaintiff's motion for protective order and Defendants' motion to compel and to extend dates are scheduled for a hearing before Magistrate Judge Elizabeth Stafford on September 6, 2017. *See* 7/21/17 Order, Doc. 45. Because all of the discovery requests at issue in these motions are Defendants' requests to Plaintiff, Defendants are at a distinct disadvantage at this stage of the litigation, having not received the discovery necessary to assert their defenses and support their counter-claims. For this reason, Defendants have not yet filed their own cross-motion for summary judgment and moved to extend the close of discovery 30 days after the resolution of the parties' discovery motions and all other dates accordingly.

## INTRODUCTION

At the heart of this dispute is the unfortunate loss of a family business, Defendant Shirley May's Place, LLC ("the Store"), which Defendant Denise A. Walsh ("Walsh" or "Mother") purchased for her and her son, Plaintiff Jason Duby ("Duby" or "Son"), out of a small inheritance that she received from her mother, Shirley May. After Shirley May passed in December 2013, Duby, an unemployed felon living with Walsh rent-free, pitched the idea of using some of his Mother's inheritance money to purchase a local restaurant. He was an experienced

1

entrepreneur, having operated his own small businesses for several years; he had also worked as a cook. His Mother agreed, as Duby was excited about the idea and there were no other opportunities for him in Morenci.

Duby investigated local businesses that were up for sale, negotiated with their owners, and chose the location that would become Shirley May's Place. Walsh told her Son that she had no interest in running a store long-term, and that after the store paid her back her principal investment, it would belong to him. At Duby's request – to avoid child support obligations – Walsh unwisely kept Duby's name off of store documents and payroll and put everything in her own name.

Duby, living with his Mother all-expenses-paid prior to and during the whole time that the store was open, was a partner with her in a family business that *he expected to own and run on his own* in a matter of years. As is demonstrated below, nothing about Duby and Walsh's arrangement resembled a traditional employer/employee relationship; Duby behaved like a putative co-owner from beginning to end.

The store was unsuccessful; it posted net losses every month it was open. Just days after Walsh closed the store closed on March 26, 2016, Duby moved out of her home. Less than a month later, on April 21, 2016, he filed this lawsuit.

Duby now asks this Court to ignore the complex reality of this case and instead to countenance his alternative reality: that he was just a regular employee of a regular

store who was duped into working for nearly two years without pay. Further, he would have this Court believe that his "employer" – not his single Mother who knew he owned a gun with a serial number scratched off – retaliated against him by filing for a PPO after he filed this lawsuit.

Neither the Fair Labor Standards Act (FLSA) nor the Michigan Workforce Opportunity and Wage Act (MWOWA) were designed to regulate the relationship between family members as business partners that is at the heart of this lawsuit. The store they opened together failed, and both Duby and Walsh saw their dreams of financial stability shattered. Duby is now using laws that were meant to protect employees – not family members running a family owned and operated business, or putative co-owners taking a business risk together for a potential future reward – to exact revenge on his own Mother for personal reasons and to take whatever inheritance she has left. This Court should not countenance such abuse of the law and the legal process.

## **FACTUAL BACKGROUND**

Walsh's mother and Duby's grandmother, Shirley May, died in December 2013 and left Walsh a small inheritance. Ex. 1, Walsh Decl. ¶ 3. Duby, a felon with four criminal convictions, whose most recent 18-month stint in prison began in 2008, was unemployed and living rent and expense free with his Mother at the time. Ex. 2, Duby Dep. 97:2-98:15, 24:24-25:3, 30:22-31:1-5. Having run his own small

3

businesses in Michigan and Florida for several years each, and having had experience as a cook in restaurants, Duby suggested that Walsh use some of her inheritance to buy a nearby restaurant, the Dari-Ette, so that they could run it together. Ex. 1 at ¶¶ 4-5; Ex. 2 at 104:15-105:18. Walsh agreed, as otherwise there were no opportunities for someone with Duby's criminal record in Morenci. Ex. 1 at ¶ 15. Duby single-handedly did the background investigation and financial negotiations with the owners of the Dari-Ette, but he eventually decided it would not be a good investment. Ex. 1 at ¶¶5-7; *see also* Ex. 3, Walsh's 2014 Diary, entries 1/23, 3/6, 3/7, 3/11, and 3/18.[1] Not knowing anything about opening or running a restaurant, Walsh trusted Duby's experience and trusted him to make the call regarding which business they should buy. Ex. 1 at ¶ 7. Another local restaurant owner, Pearl Phelps, heard that Duby and Walsh were interested in the Dari-Ette and told Duby she wanted to sell him her pizza shop. *Id*. at ¶ 8; *see also* Ex. 3 at entry 4/2. Duby said "no" because there was already a pizza shop in town and he did not want to be limited to pizza. *Id*.

Walsh then suggested they look into the Hudson Lake Market, a party store with a small kitchen that had been shuttered for some time. *Id*. at ¶ 9. Duby called

---

[1] Walsh keeps contemporaneous diaries. She writes in them at night to record the day's activities. Ex. 1 ¶ 2. As Walsh's diary is a very personal document containing irrelevant and sensitive information regarding, for example, her ex-husband and her minor son's grades, Defendants have redacted such material.

4

the owner, Jack Arnette, and set up a meeting. *Id.* at ¶¶ 9-10; Ex. 3 at entry 4/4. He then conducted due diligence, visiting the Michigan Health Department to make sure the store was in compliance with the health code. Ex. 1 ¶ 10; Ex. 3 entry 4/7. After Duby and Walsh toured the store together, Duby said he felt it was a good deal. Ex. 1 at ¶ 10.  Duby suggested that he could do the cooking and Walsh could run the register; he thought that they could make a lot of money. Ex. 1 at ¶ 10.  On April 8, Walsh wrote in her diary that Jack accepted their deposit and letter of intent and that, "It's a go **we** got the store. All of us to store to start cleaning." (Emphasis added.) Ex. 3 at entry 4/8. Duby and Walsh together attended meetings at the bank regarding the store's licensing and business accounts. Ex. 1, ¶¶ 12, 13; Ex. 3 at entries 4/11, 4/21; Ex. 4, Knox Decl., ¶ 3. At one of these meetings, Duby made clear that he wanted to keep his name off of the business paperwork and payroll, to avoid child support obligations. Ex. 4 at ¶ 5; Ex. 5, Walsh Dep., 81:21-82:2, 136:12-23, 224:3-14.[2]

In addition to initiating the idea that Walsh should purchase a business, investigating several options, deciding which one to buy, and assisting Walsh in setting up the licensing and bank accounts for the store, Duby testified that he and his Mother discussed that someday *he would be the sole owner of the store*, and that

---

[2] Duby continues to avoid his child support obligations. His current employer, Rex Crist, indicated that he was not aware that Duby had a child support order or that he even had a child. Ex. 6, Crist Dep. 10:9-11:2.

5

he hoped to own the store about five to seven years from its opening day. Ex. 2, Duby Dep. 102:22-25, 103:1-9, 165:14-22. Walsh told Duby that she did not want to run a store for the long term. Ex. 1 at ¶ 14. Rather, as soon as the store paid her back her principal investment, she planned to live off of her inheritance and travel; the store would then be Duby's to own and run. *Id*. at ¶¶ 14-16. Walsh did not expect to receive interest on her investment. *Id*.

Other than occasional help from family and Duby's girlfriend, Sondra, only Duby and Walsh ran the store. *Id*. at ¶ 18. There was no policy for sick leave or vacation days; if one of them needed or wanted to leave, the other would fill in or they would close the store. *Id*. at ¶ 20. Walsh's diaries are replete with near-daily examples of this.[3] (These details, recorded contemporaneously by Walsh in her diaries, also contradict Duby's after-the-fact calculation of how many hours he allegedly worked without pay. In Duby's document, he alleges that he worked every

---

[3] For example, On January 20, 2015, Walsh worked at the store from 2:45pm-8:00pm while Duby and Sondra went to the movies to see American Sniper; on February 2, 2015, Walsh worked at the store while Duby napped in the back from 5-8pm and then they closed the store early at 8:15pm because it was slow and Duby was not feeling well; on April 26, 2015, Walsh ran the store while Duby worked on his truck and Sondra's car, and then they closed the store and all went to the movies for a 4:50pm showing; on May 26, 2015, Walsh ran the store from 1:30-9pm while Duby worked on his truck and Adam's truck; August 4, 2015 Walsh ran the store from 8:15am to 3pm while Duby went to Jackson and to Sam's. *See* Ex. 7, Walsh's 2015 Diary entries.

6

hour that the store was open, and then some.[4]) When Duby and Walsh went on vacation together, they simply closed the store. Doc. 47-9 at 3; Ex. 5 at 233:15-234:2. On April 11, 2015, Duby and Walsh decided together to close the store on Mondays. Ex. 7, Walsh's 2015 Diary, entry 4/11. On June 13, 2015, Duby left Walsh a note that said "Let's work this out to sell store." *Id.* at entry 6/13. Duby expected that when they sold the store, he would get a $10,000 payout. Ex. 2 at 203:24-204:11; Ex. 5 at 290:2-291:12.

Duby helped himself to inventory when he was hungry, thirsty, or wanted a cigarette. *Id.* at 40:23-41:11. He did not have to wait for a break period or keep a log of the inventory he consumed. *Id.* at 160:22-161:4; *see also* Ex. 5 at 314:20-315:22. He used the store's facilities to do personal cooking and had friends over to drink beer at the store after hours. Ex. 1 at ¶ 17; Ex. 5 at 312:9-25, 316:8-16; Ex. 7 at entry 6/5. When Walsh confronted him about serving and consuming alcohol on the

---

[4] In his Motion for Summary Judgment, Duby alleges that he worked 9,700 hours, or 10-18 hour days, citing to a ledger of his hours that obviously was prepared for his lawyer after the fact. Pl's Mot. for Summ. J., Doc. 47 at p. 4; *see also* Doc. 47-9. Duby's ledger of hours – which was part of Exhibit 11 to his deposition – includes notations addressed to his attorney such as "I do not remember the exact dates" and "This was what I worked every day except the 4 days the store was closed." In his deposition, Duby testified that he had "probably" kept records of the times that he left the store, but that he did not search for them or give them to his counsel. Ex. 2, Duby Dep. 160:12-17. Defendants submitted a supplemental document request for these records and have since been told that Duby cannot find them. Ex. 8, 8/17/17 Croson Email to Tingstad. *See also* Ex. 9, Defs' Second Set of Discovery Reqs. Thus, Duby's alleged 9,700 hours of work is admittedly an overestimation.

premises, Duby told her that he could do whatever he wanted in "our store." Ex. 5 at 312:9-25. When the store was slow, Duby closed early. *See*, *e.g.*, Ex. 7 at entry 5/10. When his truck broke down, Duby spent the night in the store. *E.g. id*. at entry 4/26. During the times Duby manned the store alone, Walsh did other odd jobs to pay the bills, communicated with vendors and the store's accountant and lenders, and picked up inventory that Duby would write down on a list for her to buy. *E.g. id.* entries 1/23, 5/26-27, 6/12.

Every month that the store was open for which there are accounting records,[5] it operated at a loss. Ex. 4, Knox Decl. ¶ 7; *see also* Ex. 10, Knox Accounting Statements. When the store had a good night, Walsh noted in her diary that she "paid" both she and Duby *the same amount* of cash each. *See*, *e.g.*, Ex. 7, Walsh's 2015 Diary, entries 3/14, 3/15, 4/10. Because the store was an S-Corp., by law Walsh was required to be on payroll and receive wages. Ex. 4 at ¶ 4. For several months, Walsh paid herself $600 per week from the store, but used her portion to cover store bills. Ex. 5 at 81:3-82:7. From this amount, she gave Duby $100 weekly in cash. *Id.* She also gave her Son other amounts of money as he needed it, for example, she paid a total of $2288 for his trip to New York to bring his son to Michigan for the 2013 Christmas holiday, and she made a $45 child support payment for him on November

---

[5] Knox Accounting provided monthly accounting services for Shirley May's Place from April 2014 through July 2015. Ex. 4 at ¶ 7.

21, 2014. Ex. 11, Dates of Money Spent on Jason. Walsh understood that Duby's rent and expenses were part of his compensation during the start-up period of the business that would ultimately be his. Ex. 5 at 133:6-136:6.

Over time, Walsh began to learn from others and observe firsthand that Duby was conducting illegal activities at the store: he sold marijuana, on at least one occasion received a box of guns, he allowed his friends to loiter and drink alcohol, he fed his friends for free, and he slept at the counter. Ex. 5 at 55:22-56:11, 208:22-210:23, 247:4-251:6, 312:9-314:18, 318:4-25. Duby was also rude to customers, which caused some of them to stop coming to the store. *Id.* at 247:4-15. In addition to regularly taking food, drink, and cigarettes without paying for them, Duby began to scratch off lottery tickets without paying for them. *Id.* at 224:15-226:9. On July 25, 2015, a person named Micah came to the store and told Walsh that Duby had made an offensive Facebook post about gay people, and that many people had been offended and stopped coming to the store after that. Ex. 7 at entry 7/25. Walsh took this as a sign that she should sell the store. *Id*. She did not immediately report to police that Duby was selling marijuana as she feared she would be arrested because the store was in her name. Ex. 5 at 213:22-214:2, 319:7-12. Walsh also learned that Duby owned guns, a crime due to his status as a felon, and that one of his guns had the serial number scratched off. *Id.* at 293:25-294:20.

Largely due to Duby's behavior, the store failed and closed on March 26, 2016. Doc. 8-1, 5/6/16 Walsh Decl., ¶ 6. Around this time, Duby and Walsh's relationship had deteriorated. Duby entered the closed store and removed tools, computer equipment, and kitchen equipment. Ex. 2 at 44:24-46:6, 162:17-163:15; Ex. 5 at 126:5-20. On March 30, 2016, Walsh told Duby to move out, but he said he would not leave unless she gave him the title to the truck she had purchased. Ex. 5 at 28:9-21. She complied, and he left with the truck, as well as a bed and a chainsaw that Walsh had purchased for her home. *Id.* at 28:9-21, 51:24-52:6, 70:1-11.

At the same time, Walsh was preparing to have brain surgery in May 2016 to remove a tumor. *Id.* at 286:9-14. She was shocked when, less than a month after her Son moved out, he filed this lawsuit against her on April 21, 2016. She knew of Duby's violent tendencies and took the lawsuit as a sign that Duby's hostility toward her had risen to a new level. Fearing for her and her younger son's safety, Walsh filed for a PPO *pro se* on April 29, 2016. Ex. 5 at 267:1-25, 272:18-274:8, 281:2-18, 285:1-7; *see also* Petition for PPO, Doc. 35-3. Duby later added a claim of retaliation for Walsh's filing of the PPO. *See* Second Am. Compl., Doc. 30. Walsh underwent brain surgery on May 16, 2016 and was unable to leave her home while she recuperated. Because she was unable to appear in Court to further prosecute her PPO, she withdrew it on June 9, 2016. Ex. 5 at 110:8-9, 276:7-14; *see also* Stip. Order Terminating PPO, Doc. 39-4.

10

Shirley May's Place never cleared $200,000 in gross annual sales for any year it was open. In 2014, total sales reached $107,190.25. Ex. 12, 2014 Year-End Income Statement. In 2015, the only full calendar year the store was open, sales totaled $184,035. Ex. 13, 2015 Sales Ledger.[6] In 2016, the store was open for less than three months, and its sales were so poor Walsh's accountant told her not to file tax returns for the store because it was "a wash." Ex. 5 at 13:22-14:3.

## LEGAL STANDARD

"[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-249 (1986). An issue of material fact "is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Id.* at 249. At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.*

---

[6] In 2015, Walsh did not have a year-end report from Knox Accounting because she could no longer afford the service. Ex. 5 at 12:7-16. The last monthly report from Knox Accounting showed $108,001.18 in gross sales for January 1 through July 31, 2015. Ex. 14, July 2015 Income Statement.

## ARGUMENT

The facts recited above, when taken together, demonstrate that Duby was no ordinary employee duped into working without pay for nearly two years. He and Walsh were partners trying to get a family business off the ground – a family business that was Duby's idea, that Walsh purchased for no other purpose than to set her son up financially, and that Duby operated without formal pay because he considered himself putative co-owner who was putting in the sweat equity that he understood it would take to get his new business off the ground. He conducted himself as a business owner, notwithstanding the fact that, at his request, his name did not appear on official paperwork for the store. Duby took a calculated risk for the potential payoff of a secure financial future as the sole owner of Shirley May's Place. When his gamble did not pay off, he decided to recoup his losses by suing his principal investor, benefactor, and business partner, his Mother.

## I.    DUBY'S COUNTS I AND II FAIL BECAUSE HIS ACTIVITY AT SHIRLEY MAY'S PLACE IS NOT COVERED BY THE FLSA OR THE MWOWA.

Counts I and II of Duby's Second Amended Complaint claim violations of the FLSA and the MWOWA, respectively, for failure to pay minimum wages and overtime wages. Because the MWOWA does not apply to employees who are exempt from the minimum wage requirements of the FLSA, the following analysis

12

will focus on why Duby is not entitled to minimum wage and overtime under the FLSA. *See* M.C.L.S. § 408.420(1)(b).

In order to establish his right to minimum wage and overtime pay under the FLSA, Duby must demonstrate that he was a covered employee either by establishing "individual coverage" or "enterprise coverage." 29 U.S.C. 206(a). Duby can make neither showing. First, Duby cannot show that he benefits from individual coverage because there was no employer-employee relationship where   his labor was that of a business partner and future sole owner, differing substantially "from the traditional employment paradigm covered by the Act." *See Steelman v. Hirsch*, 473 F.3d 124 (4th Cir. 2007). _Second_, Duby cannot show he benefits from enterprise coverage as Shirley May's Place was a family-owned and operated business with an annual gross volume of sales less than $500,000, and therefore specifically exempt from the definition of "enterprise engaged in commerce" under the Act. 29 U.S.C. 203(s)(C)(2) & (A)(ii).

### a. Duby Does Not Benefit From "Individual Coverage" Because He Was A Putative Co-Owner Of Shirley May's Place, Not An "Employee."

To establish "individual coverage" under the FLSA, a plaintiff must show that he is an "employee" who is engaged in "commerce." 29 U.S.C. 206(a). While Supreme Court has said that the term "employee" in the FLSA is to be broadly construed, it has also said that the term has its limits "and those limits must be

13

defined in accordance with 'economic reality.'" *Steelman v. Hirsch*, 473 F.3d 124, 128 (4th Cir. 2007). To determine whether a person is an employee in a particular "economic reality," courts "examine the circumstances of the whole activity, rather than isolated factors, or technical concepts." *Id.*

In *Godoy v. Rest. Opportunity Ctr. of N.Y., Inc.*, a group of restaurant workers who had devoted hundreds of hours of "sweat equity" in explicit exchange for future co-ownership of a restaurant business that they and defendants had not yet created, sued the non-profit for whom they had been laboring for violations of the FLSA. 615 F. Supp. 2d 186, 195 (S.D.N.Y. 2009) Finding an absence of an employer-employee relationship, the district court analogized to the economic reality of a partnership:

> Like partners at a firm, Plaintiffs, as putative co-owners of the business they were working to create, "assume[d] the risks of loss and liabilities" of the venture, and had a real opportunity to share in its profits upon success. Plaintiffs' hours of "sweat-equity" represented their "capital" contribution to the business . . . the Court notes that Plaintiffs were . . . tasked with the management of the restaurant's planning and development phase. . . As Plaintiffs and Defendants were at all relevant times putative co-owners of the restaurant they were working to create, the Court finds that Plaintiffs were not, as a matter of economic reality, the employees of Defendants. As such, Plaintiffs have no claims under the FLSA. *Id.* [7]

---

[7] Other courts have examined the economic realities of putative co-owners and reached the same conclusions. Where *See*, *e.g.*, *Steelman v. Hirsch*, 473 F.3d 124, 125, 130-31 (4th Cir. 2007) (finding that married couple's work together in a dog grooming business that only one of them technically owned did not fall within the employer-employee relationship where their endeavor was "significantly entrepreneurial" and there was a "real opportunity to share in the profits of the business."), *Emanuel v. Rolling in the Dough, Inc.*, 2012 U.S. Dist. LEXIS 166206,

This case is analogous to *Godoy*. Duby, as an experienced business owner who asked his Mother to use her inheritance money to purchase a local business that he could run, "assume[d] the risks of loss and liabilities of the venture, and had a real opportunity to share in its profits upon success." 615 F. Supp. 2d 186, 195 (S.D.N.Y. 2009). Duby understood that his work would be "sweat equity" as he testified that he discussed with his Mother that he would own the store after she had been paid back her capital investment, and he understood it would take five to seven years for the store to become profitable. Ex. 2 at 102:22-103:9, 165:14-22. Duby also took on the management tasks of the store's planning and development phases as well as day to day managerial control, as has been demonstrated extensively throughout the fact section of this brief (see pages 3-9 above). From beginning to end, Duby was a putative co-owner of Shirley May's Place. When the circumstances of Duby's relationship to Defendants are considered in their totality, the economic reality indicates that Duby was not an employee within the meaning of the Act.

      **b.**    **Duby Does Not Benefit From "Enterprise Coverage" Because Shirley May's Place, As A Family Owned And Operated Business With Annual Gross Sales Under $500,000 Is Exempt From The FLSA.**

---

*16-17 (N.D. Ill. Nov. 21, 2012) (dismissing FLSA suit brought by ex-girlfriend who worked for no wages to assist her boyfriend to secure a pizza franchise).

To establish "enterprise coverage" a plaintiff must show that he was an "employee" who was "employed" by an "enterprise engaged in commerce." 29 U.S.C. 206(a)(1). The FLSA specifically excludes from its definition of "enterprise engaged in commerce" "[a]ny establishment that has as its only regular employees the owner thereof or the parent, spouse, child, or other member of the immediate family of such owner shall not be considered to be an enterprise engaged in commerce . . ." 29 U.S.C. § 203(s)(C)(2). This exclusion applies here.

The only people who regularly ran Shirley May's Place were Duby and Walsh, mother and son who, at the time, were cohabitating. Ex. 1 ¶ 4. A few other family members and Duby's girlfriend, Sondra, helped out occasionally, but they were not employees and were not put on any type of schedule to work. *Id*.; *see also* Ex. 5 at 185:10-187:18 (testifying that she called Sondra to come and help at the store "a few" times but that Sondra was mostly there to eat for free and because Duby wanted her to be there).

Duby has provided no proof of Sondra's alleged employment or work hours beyond the "few" occasions Walsh testified that Sondra helped informally over the nearly two years the store was open. But even if Shirley May's Place had formally employed Sondra infrequently, irregularly, or sporadically (it did not), this would not change the application of the family business exclusion here. The Code of Federal Regulations provides that the exception includes "family operated

16

establishments which only employ persons other than members of the immediate family infrequently, irregularly, and sporadically." 29 C.F.R. § 779.234.

In addition to the family business exclusion, there is an exclusion for small local retail merchants whose annual gross sales volume is under $500,000 per year. 29 U.S.C. § 203(s)(1)(A)(ii). This exclusion is commonly referred to as the "mom & pop" exclusion.

Shirley May's Place is not an "enterprise engaged in commerce" under the Act because its annual gross sales volume never reached $500,000 per year. In 2014, its gross receipts or sales reached only $107,190.25. *See* Ex. 12. In 2015, its gross receipts or sales reached only $184,035. *See* Ex. 11. The store was open for less than three months in 2016, and sales were so bad that Walsh's new accountant told her it was "a wash." Ex. 5 at 13:22-14:3. As Walsh and Duby were the only people who ran the store on a regular basis, and as Shirley May's Place never broke $500,000 gross annual sales, Duby cannot establish "enterprise coverage" under the FLSA.

## II.  WALSH IS NOT AN EMPLOYER WITH INDIVIDUAL LIABILITY BECAUSE DUBY OPERATED THE STORE AS A CO-OWNER.

For the same reasons that Duby is not an "employee," Walsh is not an "employer" individually liable under the FLSA or MWOWA. *See* Section I(a), above. Duby alleges that Walsh's individual liability is a given because she was the "only corporate officer and only owner" and that she had "complete financial control" of the store and "used it to pay herself, but not Duby, wages." Pl's Mot. for

Summ. J., Doc. 47, p. 19. He alleges that "[s]he set the hours of operation and had control over who accessed the store." *Id.* Not only does this facile argument elevate form over substance, but these allegations have been powerfully rebutted by Walsh's and Duby's testimony, Knox's declaration, and other documentary evidence.

First, Walsh was the only corporate officer and owner because Duby specifically did not want his name to be on anything or to receive a payroll check to avoid child support. Ex. 4 ¶ 5; Ex. 5 at 136:12-23. But in practical terms – regardless of whose name was on the official papers – Duby behaved as a putative co-owner from beginning to end: from initiating the idea to purchase a local business to choosing the Hudson Lake Market and planning to be the sole owner of the store in a matter of years; from coming and going without a set schedule, sick, or vacation time; from using the store facilities for personal purposes and telling his Mother he can do what he wants with "our store" – including consuming alcohol on the premises without a license – to deciding with his mother when to change store hours and when to sell. *See* pages 3-9, above.

Second, Walsh only paid herself "wages" of $600 per week for a few months because, as the sole shareholder/employee of an S-Corp, she was required by law to do so. Ex. 4 at ¶ 4. These "wages" were not coming out of the store's profit margin, as the store did not make a profit in any month for which there is an accounting. *Id.*

18

at ¶ 7. For this reason, Walsh used her "wages" to pay store bills and gave 1/6th of her weekly "wage" to Duby in cash. Ex. 5 at 81:3-82:7.

Finally, Walsh did not have control over who accessed the store. She testified that both she and Duby had a keys and that Duby brought Sondra and other friends there even though Walsh did not want her to be there. Ex. 5 at 126:23-25, 186:5-10, 187:1-18, 251:18-252:14. She also testified that she could not control what Duby did at the store, even though she confronted him about drinking and serving alcohol on the premises and selling marijuana out of the store. *Id.* at 312:9-25, 214:4-10, 215:14-216:10. Because Walsh and Duby's relationship cannot be properly considered one of employer-employee under the FLSA, Walsh is not individually liable.

## III.   DUBY'S COUNT III FAILS BECAUSE HE CANNOT SHOW RETALIATORY MOTIVE WHERE WALSH TESTIFIED THAT SHE TRULY FEARED FOR HER LIFE BUT WAS FORCED TO WITHDRAW HER PETITION BECAUSE SHE WAS RECOVERING FROM BRAIN SURGERY.

Duby argues that his Mother's *pro se* PPO, filed the day after she was served with this lawsuit, is "nearly dispositive evidence" of retaliation on its own. Doc. 47 pp. 17-18. But the cases that Duby cites for this *res ipsa*-type argument are light-years from the facts at hand. In none of these cases were the employer and employee intimate family members who had just lived together for nearly two years, and in

19

none of the cases was the alleged "retaliation" a *pro se* petition for a PPO.[8] Moreover, one of the cases Duby cited, *Nguyen v. City of Cleveland*, 229 F.3d 559 (6th Cir. 2000), actually rejects a claim of retaliation because "temporal proximity alone will not support an inference of retaliatory discrimination when there is no other compelling evidence." *Id.* at 566 (internal citation omitted).

Duby alleges that Walsh dropped her PPO because she did not want to go under oath, Doc. 47 p. 8, when he knows that the real reason his Mother dropped her PPO was that she was ill at home, recovering from brain surgery and unable to make it to Court. Ex. 5 at 275:10-276:14. When Walsh finally was able to testify regarding her PPO under oath at her deposition, she made clear that her fear was genuine and based on her personal experiences with him: he had bragged to her about killing another inmate in prison, *id.* at 59:22-25; he owned guns, at least one with the serial number scratched off, *id.* at 272:18-273:12; 293:25-294:20; he told her that he beat a man so badly that he broke his hand, *id.* at 271:9-24; and he often commented that

---

[8] In *Smith v. City of Salem, Ohio*, 378 F.3d 566 (6th Cir. 2004), the employee was a transsexual firefighter who was suspended days after contacting the Mayor regarding his discriminatory treatment at work and receiving a "right to sue" letter from the EEOC; in *Nguyen v. City of Cleveland*, 229 F.3d 559 (6th Cir. 2000), the alleged retaliation was a failure to promote the plaintiff after he filed discrimination claims against the city; and in *Asmo v. Keane, Inc.*, 471 F.3d 588 (6th Cir. 2006), the alleged retaliation was an elimination of the plaintiff's position as part of a reduction in force shortly after she told her employer that she was pregnant with twins; the court held only that the proximity in time was "sufficient to establish a link . . . for the purposes of a prima facie case." *Id.* at 594.

if someone made him angry he would shoot or beat them with a baseball bat, *id.* at 281:2-15. She also explained why she did not mention the guns in her PPO petition – a motherly, yet misguided desire to keep him out of jail: "I was in so much distress, if I would have put the gun down and they would have went after him, he's a two time convicted felon . . . I didn't want him to go to jail – just to stay away from me." *Id*. at 273:9-274:8.

Walsh's statement that she "had never been sued by her own son" – far from an "admission" of retaliation – demonstrates that she perceived the filing of this lawsuit to be an unprecedented escalation of a very personal conflict between her and her Son, which gave her reason to fear that he would lash out in violence. Ex. 5 at 266:24-267:25. Duby's claim of retaliation must fail.

## IV.   THERE ARE DISPUTED ISSUES OF MATERIAL FACT REGARDING EACH OF WALSH'S COUNTERCLAIMS.

### a.   Duby Converted Defendants' Property When He Wrongfully Took Items From The Store And His Mother's Home.

Common law conversion in Michigan "is defined generally as any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein. The 'gist' of a conversion claim is that the defendant has interfered with the plaintiff's control and use of its property." *Murray Hill Publ'ns, Inc. v. ABC Communs., Inc*., 264 F.3d 622, 636-637 (6th Cir. 2001) (citing *Sarver v. Detroit Edison Co*., 571 N.W.2d 759, 761-62 (Mich. Ct. App. 1997)

(internal quotations omitted). Statutory conversion in Michigan requires the stealing or converting of property "to the other person's own use." MCL § 600.2919a(1)(a). Statutory damages are three times the amount of actual damages sustained, plus costs and reasonable attorney fees. *Id.*

Walsh alleges that Duby converted property that belonged to her and Shirley May's Place; Duby admits he took the property and still has it in his possession, but alleges that it belonged to him. When the store closed, Duby took items belonging to the store or his Mother, for example: (1) DeWalt tools Walsh purchased for the store; (2) Walsh's laptop computer; (3) stainless steel bowls; (4) aprons; (5) pots and pans; and (6) a food-saver vacuum sealer. Ex. 2 at 44:24-46:6, 162:17-163:15; Ex. 5 at 126:5-20. Duby claims that these items belonged to him. Ex. 2 at 44:24-46:6. When he moved out of Walsh's home, Duby took (1) a truck that Walsh bought for $3500, and for which she paid the insurance, plate and title transfer, and purchased nearly $2500 worth of parts, Ex. 5 at 22:13-17, 28:9-21, 125:3-8; Ex. 2 at 44:1-8; Ex.11; (2) a chainsaw that Walsh purchased for her home for $250, Ex. 5 at 51:24-52:6; Ex. 2 at 164:17-165:9; and (3) a bed that Walsh purchased for her home for $381, Ex. 5 at 70:1-11, Ex. 2 at 44:9-20, 170:22-171:2.  Again, Duby claims that these items are rightfully his. These issues of fact are clearly disputed and therefore inappropriate for summary judgment at this stage.

**b.    In The Alternative, Duby Was Unjustly Enriched When He Benefitted From The Funds And Property He Received, Took, Or Held From Defendants.**

If a defendant has been unjustly or inequitably enriched at the plaintiff's expense, the law will imply a contract to prevent unjust enrichment. *Morris Pumps v. Centerline Piping, Inc*., 729 N.W.2d 898, 904 (Mich. Ct. App. 2006). "[T]o sustain a claim of quantum meruit or unjust enrichment, a plaintiff must establish (1) the receipt of a benefit by the defendant from the plaintiff and (2) an inequity resulting to the plaintiff because of the retention of the benefit by the defendant." *Id*. (internal citation omitted).

First, Duby had an agreement with his Mother that he would pay back the investment she put into the store. Duby's illegal activities and theft of store inventory made it impossible for the store to turn a profit. Second, as to the property Defendants allege that Duby converted, (detailed above on p. 19), his retention of such property for personal use constitutes unjust enrichment. Finally, Duby benefitted from free room and board for nearly two years, which Walsh provided as part of their understanding to get the family business – Duby's future business – up and running.

**c.    Duby Tortiously Interfered With Defendants' Business Relationships.**

In Michigan, a claim of tortious interference with a business relationship has four elements:

23

> (i) the existence of a valid business relationship or expectancy; (ii) knowledge of the relationship or expectancy on the part of the defendant; (iii) intentional interference causing or inducing a termination of the relationship or expectancy; and (iv) resultant actual damage. The intentional interference element requires more than just purposeful or knowing behavior; the plaintiff must also allege that the interference was either (1) a per se wrongful act or (2) a lawful act done with malice and unjustified in law for purpose of invading the contractual rights or business relationship of another.

*Trarms, Inc. v. Leapers, Inc.*, 2017 U.S. Dist. LEXIS 70998, *15-16 (E.D. Mich. May 10, 2017) (internal citations and quotations omitted).

Defendants have demonstrated all four elements. First, Defendants had a valid business relationship with established customers who came to the store and later told Walsh that they had stopped coming because of Duby's behavior. *See, e.g.*, Ex. 5 at 247:4-15, 248:20-249:12, 249:19-252:14; Ex. 7 at entry 7/25. Second, Walsh knew of these business relationships because she worked at the store often and recognized community members who were customers of the store. Ex. 5 at 248:20-251:17. Third, Duby intentionally interfered both by conducting illegal activities at the store (per se wrongful acts) as well as lawful acts done with malice, such as making a Facebook post that would alienate customers, being rude to customers, and allowing his friends to hang out at the store. Ex. 5 at 249:19-252:14, 317:8-318:25; Ex. 7 at entry 7/25. Finally, Defendants were damaged when customers stopped coming in and sales declined. Ex. 5 at 249:19-23, 254:14-18.

It is unnecessary to include testimony of the customers at this stage where Walsh's claims of per se wrongful conduct would reasonably make customers uncomfortable; Defendants have thus demonstrated a plausible causal relationship between Duby's conduct and decreased sales. *See Trarms*, 2017 U.S. Dist. LEXIS 70998 *18-20 (finding a plausible causal relationship between defendants' alleged defamation per se and plaintiff's loss of business, even though plaintiff did not allege a specific terminated relationship with a specific customer).

## CONCLUSION

For the foregoing reasons, Defendants Denise Walsh and Shirley May's Place, LLC respectfully request that this Court deny Plaintiff Jason Duby's motion for summary judgment.

Respectfully submitted,

HOOPER HATHAWAY, P.C.

Dated: August 21, 2017          BY:   /s/ Ashley Waddell Tingstad
                                      Ashley Waddell Tingstad (P81463)
                                      126 South Main Street
                                      Ann Arbor, MI  48104
                                      (734) 662-4426
                                      atingstad@hooperhathaway.com
                                      Attorney for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on August 21, 2017, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to counsel of record.

HOOPER HATHAWAY, P.C.

BY:   /s/ Ashley Waddell Tingstad
Ashley Waddell Tingstad (P81463)
126 South Main Street
Ann Arbor, MI  48104
(734) 662-4426
atingstad@hooperhathaway.com
Attorney for Defendants